USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/16/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA

-against-

SANTIAGO NUNEZ,

                    Defendant.

23 Cr. 517 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Santiago Nunez, a prisoner serving a 32-month sentence, moves for a six-month reduction of his term of imprisonment to be substituted by a six-month increase of his term of supervised release, under the federal compassionate release statute, 18 U.S.C. § 3582(c)(1)(A). *See* Mot., ECF No. 31; Supp. Mot., ECF No. 42. The Government opposes the application. *See generally* Opp., ECF No. 35; Supp. Opp., ECF No. 43. For the reasons stated below, Nunez's motion is GRANTED.

## BACKGROUND

On three occasions in early 2023, Nunez sold fentanyl and a fentanyl analogue to an undercover law enforcement officer in the Bronx. *See* Presentence Investigation Report ("PSR") ¶¶ 8–9, 11, 14, ECF No. 22. Nunez was arrested on March 7, 2023, following a five-minute chase in which Nunez attempted to evade law enforcement. *Id.* ¶ 16. After his arrest, he was detained at MDC. *See* Def. Sent'g Mem. at 8, ECF No. 25. On October 5, 2023, Nunez was charged with conspiring to distribute and possess with intent to distribute (i) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl and (ii) 100 grams and more of mixtures and substances containing a detectable amount of para-fluorofentanyl, an analogue of fentanyl, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. ECF No. 15. The following day, he pleaded guilty to Count 1 of the information. PSR ¶ 4. The offense carried a

mandatory minimum sentence of 120 months, however the parties and the Probation Office agreed that Nunez was safety-valve eligible.  *See* Def. Sent'g Mem. at 2; Gov't Sent'g Mem. at 3, ECF No. 26; PSR ¶ 81.  Based on Nunez's safety-valve eligibility, acceptance of responsibility, and criminal history category of I, the parties agreed to an adjusted offense level of 27, with a Sentencing Guidelines range of 70 to 87 months' imprisonment.  Gov't Sent'g Mem. at 3.

At his March 26, 2024 sentencing, the Court found that Nunez was safety-valve eligible and the applicable Guidelines range was 70 to 87 months' imprisonment, followed by two to five years of supervised release.  Sent'g Tr. at 5:19–23, 6:8–9, ECF No. 29.  Considering the factors set forth at 18 U.S.C. § 3553(a), the Court noted that fentanyl is a highly dangerous and often lethal drug; that most defendants similarly situated to Nunez receive a downward variance or departure; that Nunez experienced unusually harsh conditions of confinement at MDC since his arrest; that he had a difficult childhood in which he was abused and shot in the chest, causing him lasting mental and physical pain; that his family members detailed his caring nature and his commitment to supporting his son and ailing father; and that he expressed clear remorse and accepted responsibility for his actions.  *Id.* at 19:5–6, 13–16; 19:16–20:24; 21:3–14; 21:15–22:4; 22:5–7.  For all of these reasons, the Court found that a variance below the Guidelines range was appropriate and a sentence of 32 months' imprisonment followed by two years of supervised release would be sufficient but no greater than necessary to promote the goals of sentencing.  *Id.* at 22:18–23.

Following his sentencing, Nunez returned to MDC, where he was detained until earlier this month, when he was moved to a halfway house to serve out the remainder of his sentence.  Supp. Mot. at 4; *see* Fed. Bureau of Prisons, *Find an Inmate*, https://www.bop.gov/inmateloc

(query "Santiago Nunez") (last visited Oct. 16, 2024).  The Bureau of Prisons ("BOP") projects that Nunez will complete his term of custody in approximately five-and-a-half months, on or around March 31, 2025.  *See* Fed. Bureau of Prisons, *Find an Inmate*, https://www.bop.gov/inmateloc (query "Santiago Nunez") (last visited Oct. 16, 2024).

On May 14, 2024, Nunez moved *pro se* for compassionate release.  *See generally* Mot.  He articulates two grounds for relief.  First, the mother of Nunez's son, Elaine Camilo Montero, has breast cancer, and the effects of her illness and treatment have caused a lapse in care for Nunez's son and the son's half-brother.[1]  *Id.* at 1–2, 15.  Second, Nunez has faced uniquely difficult conditions of confinement in MDC, which is "short of staff" and lacking in "basic []or proper Medical/Mental Treatment."  *Id.*

The Government opposes the motion, arguing that Camilo Montero is not incapacitated by her illness, and that it is only "difficult" but not impossible for her to care for Nunez's son and the son's half-brother.  *Id.* at 6.  The Government further contends that the conditions in MDC, although challenging, do not present an extraordinary and compelling basis for a sentence reduction.  *Id.* at 7.  It highlights that Nunez has presented no evidence of receiving improper medical or mental health treatment at MDC post-sentencing and that, even if Nunez were eligible for compassionate release, the sentencing factors set forth at 18 U.S.C. § 3553(a), particularly the serious nature of Nunez's offense, would counsel against a sentence reduction.  *Id.* at 7–8.

On July 18, 2024, the Court appointed counsel to represent Nunez.  ECF No. 36.  On September 5, 2024, Nunez filed a letter supplementing his motion.  Supp. Mot.; *see* ECF No. 40.  The letter explains that Nunez's seven-year-old son has a learning disability and is receiving

---

[1] Nunez's son is seven years old and the son's half-brother is eleven.  *See* PSR ¶ 50; Supp. Mot. at 2.  Although Nunez's son's half-brother is not Nunez's biological child, the child "has no relationship with his birth father and has always viewed Mr. Nunez as a father figure; likewise, Mr. Nunez considers [him] to be his son and he has cared for him regularly."  Supp. Mot. at 2.

3

psychological treatment for behavioral issues. Supp. Mot. at 2. It also details the current state of Camilo Montero's illness: The side effects of her cancer treatment cause her "severe pain," leaving her "unable to get out of bed" and unable to "tend to her children, handle household tasks, or leave the home." *Id.* at 3. When the symptoms are at their worst, which generally occurs during "the several days following her [monthly] Zoladex injections," Camilo Montero cannot "take her children to school or school-related meetings or activities," "cannot take [Nunez's son] to his therapy appointments," and "cannot go grocery shopping" or "spend meaningful time with [the children]." *Id.* at 2–3. Although Camilo Montero previously relied on others to help with the children, the letter states that "she no longer has that option." *Id.* at 3 (explaining that Camilo Montero's mother lives abroad, Nunez's father is blind and ill, Nunez's mother cares for his father full-time, and Camilo Montero cannot afford to pay others to transport and care for her children because she has lost the ability to work). Simply put, the letter contends, "there are no other available adult caregivers" besides Nunez who could "help care for [the] children." *Id.* at 3.

The Government contends that each of the arguments Nunez makes in support of a sentence reduction were advanced before the Court and considered by the Court at sentencing. Supp. Opp. at 1. It claims that "nothing about [Camilo] Montero's underlying medical condition has materially changed"; she is not "prevent[ed] from working or acting as a caregiver altogether"; and "other caregivers are available to help," namely Nunez's mother, his siblings, and his current girlfriend. *Id.* at 2–3. It further contends that Nunez's continued incarceration at MDC is immaterial, because his past incarceration there was taken into account at sentencing and he has recently been moved to a halfway house. *Id.* at 3 & n.6. Finally, the Government argues that a sentence reduction would "result in a sentence that fails to reflect the seriousness of

4

the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.* at 4.

## LEGAL STANDARD

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes the Court to modify a term of imprisonment if it finds that: "(1) extraordinary and compelling reasons warrant such a reduction; (2) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the § 3553(a) factors weigh in favor of a reduction in sentence." *United States v. Saez*, No. 16 Cr. 317, 2024 WL 303847, at *2 (S.D.N.Y. Jan. 26, 2024) (quotation marks omitted).[2]

The First Step Act of 2018 was adopted to increase the use of compassionate release, permitting courts to grant such motions even where the BOP denies a defendant's request for a sentence reduction. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (captioned "Increasing the Use and Transparency of Compassionate Release"). Consistent with that purpose, "[a] district court has broad discretion when considering a motion for compassionate release and may consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring." *United States v. Sanchez*, No. 01 Cr. 74, 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (citations omitted).

To determine whether "extraordinary and compelling reasons" exist, the Court looks to—but is not constrained by—the United States Sentencing Commission's Policy Statement at U.S.S.G. § 1B1.13. As relevant here, § 1B1.13(b)(3)(A) provides that the "incapacitation of the caregiver of the defendant's minor child" is an "extraordinary and compelling" reason for a

---

[2] Section 3582 also requires the movant to exhaust administrative remedies by requesting compassionate release from prison authorities. *See United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (citing 18 U.S.C. § 3582(c)(1)(A)). The Government does not contest that Nunez has satisfied this requirement by requesting release from the warden of his facility. *See* Mot. at 15–16.

sentence reduction. Section (b)(5) further provides that any "other circumstance or combination of circumstances" that is "similar in gravity to" the enumerated circumstances of the policy statement can constitute an extraordinary and compelling reason for a sentence reduction. U.S.S.G. § 1B1.13(b)(5). Section (b)(5), commonly referred to as the "catchall provision," recognizes that the Sentencing Commission "could not possibly identify the myriad extraordinary and compelling reasons that might warrant a sentence reduction" and that "judges are 'in a unique position to determine . . . what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence.'" *United States v. Cromitie*, No. 09 Cr. 558, 2024 WL 216540, at *5 (S.D.N.Y. Jan. 19, 2024) (quoting U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 207); *United States v. O'Bryant*, No. 16 Cr. 317, 2023 WL 8447995, at *5 (S.D.N.Y. Dec. 6, 2023) (same). A defendant bears "the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist." *United States v. Gotti*, 433 F. Supp. 3d 613, 619 (S.D.N.Y. 2020).

In addition, the Court must consider whether a sentence reduction is consistent with the factors set forth in 18 U.S.C. § 3553(a). *Saez*, 2024 WL 303847, at *2. Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a).

**DISCUSSION**

The Court finds that a sentence reduction is merited based on a combination of circumstances: (1) Camilo Montero's symptoms partially and, at times, entirely incapacitate her, making it impossible for her to provide consistent care for Nunez's son; (2) Nunez's son has a greater than ordinary need for parental support as a result of his learning disability, behavioral health struggles, and tender age; and (3) Nunez has endured unanticipated and uniquely onerous conditions of incarceration. A sentence reduction also comports with the § 3553(a) factors. Nunez committed a serious albeit nonviolent offense, for which he immediately accepted responsibility. He has served more than half of his sentence in conditions that are akin to time-and-a-half or double time served, Sent'g Tr., *United States v. Gonzalez*, 18 Cr. 669 (S.D.N.Y. Apr. 2, 2021), ECF No. 250 at 17:18–18:5, in a facility to which BOP no longer designates defendants to serve their sentences. He has made exceptional progress toward rehabilitation. And he presents no danger to the community. To the contrary, the record reflects that his community needs him and that he is ready and willing to be of help.

I.   Extraordinary and Compelling Reasons

Nunez's motion is based on a constellation of extraordinary and compelling circumstances. The Court will address each in turn, although pursuant to the catchall provision, its adjudication is based on their cumulative effect.

A.   The Effects of Camilo Montero's Cancer on Nunez's Son

Nunez contends that his son's lack of a consistent parental caregiver constitutes an extraordinary and compelling reason for a sentence reduction. Supp. Mot. at 2. The Government argues that the evidence presented by Nunez, including Camilo Montero's statements and the letter and attachments from her treatment team, do not establish that Camilo

Montero is "incapacitated" within the meaning of § 1B1.13(b)(3)(A).  Supp. Opp. at 2.  The Court finds it unnecessary to decide whether the evidence suffices to establish the "incapacitation" of Camilo Montero, a term the Policy Statement does not define, because Camilo Montero's physical debilitation, however understood, constitutes an extraordinary and compelling basis for a sentence reduction when considered alongside the other adverse circumstances described below.  *See United States v. Khan*, No. 18 Cr. 830, 2023 WL 2911021, at *3–4 (S.D.N.Y. Apr. 11, 2023).

Camilo Montero has "locally advanced breast cancer."  ECF No. 42-1.  Following a double mastectomy and chemotherapy, she began in early 2024 a course of hormone therapy for advanced-stage breast cancer that includes medication and monthly injections.  *Id.*; Camilo Montero's 2d Ltr., ECF No. 42-2.  Camilo Montero is required to adhere to her course of treatment for the next 1.5 to 4.5 years.  *See* Camilo Montero's 2d Ltr; *see also* Mot. at 4.  The treatment can cause—and, in the case of Camilo Montero, has caused—severe and debilitating side effects.  Mot. at 4–14; Camilo Montero's 2d Ltr.  The side effects from Camilo Montero's monthly injections in particular are so severe that for several days following an injection, Camilo Montero "cannot tend to her children, handle household tasks, or leave the home," including "to take her children to school or school-related meetings or activities."  Supp. Mot. at 2–3.

The Government contends that although Camilo Montero's illness is serious and unfortunate, "nothing about [her] underlying medical condition has materially changed since the Court sentenced [Nunez]."  Supp. Opp. at 2.  The Court disagrees.  As an initial matter, the premise of the Government's argument is flawed: "[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13(e).  More importantly, however, Camilo Montero's

8

circumstances have changed. The evidence presented at sentencing included a statement from Camilo Montero indicating only that her illness and treatment made it "difficult" to care for her children without Nunez's assistance. Camilo Montero 1st Ltr., ECF No. 25-1; *see also* Sent'g Tr. at 13:20–21, 15:20–21 (explaining only that Camilo Montero was "getting chemotherapy" and "had a double mastectomy"); PSR ¶ 50 (same). And, when it was especially difficult for Camilo Montero to care for the children on account of her illness, she was able to pay others to take the children to school. Mot. at 1.

In April 2024, shortly after the Court sentenced Nunez, a social worker assigned to Camilo Montero's care team reported that Camilo Montero's treatment was beginning to "make[] it difficult for [her] to work." ECF No. 42-1. Over time, what was originally a "difficulty" working has progressed to the point where Camilo Montero is now "unable to work due to her medical condition." Supp. Mot. at 3. And because she is not working, she can no longer "afford to pay other people to watch her children, or to take them to school or appointments," which she was able to do "in the past." *Id.* As a result, her children, ages seven and eleven, consistently miss school and are "depriv[ed] . . . of their educational, emotional and developmental needs." *Id.*; *see* Camilo Montero 2d Ltr. at 2–3. Camilo Montero may not be incapacitated on a daily basis, but her illness and debilitating symptoms, compounded by her inability to work, have left her unable to provide the consistent, basic care that her children require.

The Court is also aware that Nunez's son requires greater than ordinary care. The child, at seven years old, has learning disabilities and is undergoing psychological treatment for behavioral issues. Supp. Mot. at 2; *see also* Camilo Montero 2d Ltr. at 3. When Camilo Montero's symptoms are most debilitating, she cannot take him to his therapy appointments,

9

further enhancing the risk that the child's psychological, behavioral, and developmental conditions will worsen. Supp. Mot. at 2–3; *see also* Camilo Montero 2d Ltr. at 3 (explaining that the child's condition has in fact worsened during Nunez's absence). In sum, Camilo Montero's illness has "ma[de] it extremely difficult, if not impossible," for her to provide Nunez's son with the special degree of care that he needs. Supp. Mot. at 2.

The Government argues that the child's lack of a consistent parental caregiver is immaterial because "other caregivers are available to help." Supp. Opp. at 2. Nunez emphasizes, however, that Camilo Montero's mother lives in the Dominican Republic and his own mother is unable to assist because she provides full-time care to his father, who is blind and ill, and "whose health has worsened since Mr. Nunez's sentencing." Supp. Mot. at 3. Even assuming others could assist in the care of Nunez's son, the Court declines to read into the Policy Statement a requirement that the defendant be the *sole* available caregiver to his child to qualify for compassionate release. The Policy Statement requires that a defendant be "the only available caregiver" when seeking compassionate release on the basis that his spouse, parent, or sibling is incapacitated, but the Statement notably does *not* impose such a requirement when the basis for relief is the death or incapacitation of the caregiver of the defendant's minor child. *Compare* U.S.S.G. § 1B1.13(b)(3)(A), *with id.* § 1B1.13(b)(3)(B)–(C). The absence of such a requirement in § 1B1.13(b)(3)(A) reflects the Sentencing Commission's recognition of the unique and irreplaceable role that primary caregivers play in their children's lives. It affirms that no "patchwork arrangement" of inconsistent and temporary assistance could provide Nunez's son, in his delicate and developing state, the degree of care the child requires and would obtain but for his mother's condition and his father's incarceration. *United States v. Francisco-Ovalle*, No. 18 Cr. 526, 2022 WL 1094730, at *2 (S.D.N.Y. Apr. 12, 2022) (granting compassionate release to a

10

defendant who was the only family member that could "care *reliably* for his two minor children," even though a "patchwork arrangement" of others was temporarily available to assist (emphasis added)).

For all of these reasons, the Court finds that Camilo Montero's illness and her inability to provide Nunez's son the quality and consistency of care he requires weigh in favor of compassionate release.

### B. Nunez's Incarceration in MDC

After his arrest in March 2023, Nunez was detained for over nineteen months at MDC. He contends that the unusually harsh conditions of confinement he experienced there further weigh in favor of a sentence reduction. Supp. Mot. at 4. The Government argues that MDC's conditions are immaterial because the Court already took them into account at sentencing. Supp. Opp. at 3.

The Court disagrees with the Government. The sentence imposed in this matter took into account the uniquely harsh conditions Nunez experienced at MDC prior to sentencing, conditions which included perpetual lockdowns, inadequate medical care, and staggering violence that "ma[de] time spent there essentially the equivalent of either time and a half or two times what would ordinarily be served." Sent'g Tr. at 20:8–11. The Court was not aware, and thus did not consider, that Nunez would return to MDC after sentencing to serve out the remainder of his term of confinement. And, indeed, the conditions Nunez faced in MDC after his sentencing were unusually harsh. Nunez reports that, in April 2024, "there were reports of maggots or weevils found in the food being served to inmates." Supp. Mot. at 4. Multiple MDC inmates were murdered at the facility in the summer of 2024. *Id.* at 4–5 (citing news reports). The conditions inside MDC have worsened to such a degree that the BOP has recently ceased

11

designating prisoners to serve their sentences at MDC altogether.[3]

Courts in this Circuit have repeatedly recognized that the harsh conditions at the area's jails counsel in favor of a shorter overall sentence. *See, e.g.*, Sent'g Tr., *Gonzalez*, 18 Cr. 669, ECF No. 250 at 17:18–18:5; *United States v. Chavez*, 710 F. Supp. 3d 227, 228–38 (S.D.N.Y. 2024). As the Honorable Gary R. Brown remarked months after Nunez was sentenced, within MDC, "[c]haos reigns, along with uncontrolled violence." *United States v. Colucci*, No. 23 Cr. 417, 2024 WL 3643857, at *4 (E.D.N.Y. Aug. 5, 2024). The approximately six-and-a-half months Nunez spent at MDC after sentencing are "materially different than [time] served at a jail or prison elsewhere in the United States," *Colucci*, 2024 WL 3643857, at *7, and the Court recognizes that "it is routine for judges in both this District and the Eastern District [of New York] to give reduced sentences to defendants based on the[se] conditions," *Chavez*, 710 F. Supp. 3d at 229. Nunez therefore has endured "conditions of confinement that were not contemplated at the time that the Court imposed [his] sentence." *United States v. Herbert*, No. 03 Cr. 211, 2024 WL 1931962, at *2 (S.D.N.Y. May 2, 2024); *see also United States v. Lopez*, No. 16 Cr. 317, 2024 WL 964593, at *5 (S.D.N.Y. Mar. 5, 2024) (finding that "the lockdowns and associated rigors experienced by" the defendant "qualify, under the catch-all provision of this guidance, as an extraordinary and compelling reason justifying a sentence reduction"). This factor, therefore, also weighs in favor of a sentence reduction.

II.     Section 3553(a) Factors

The § 3553(a) factors support granting the requested relief. There is no doubt that Nunez's criminal conduct and the circumstances of his arrest are serious wrongs that must

---

[3] *See* Veronica A. Guerrero, Maya A. Kouassi, Marcus A. Asner & Lee M. Cortes, Jr., *A Half Measure: BOP No Longer Sending Sentenced Defendants to Troubled Brooklyn Detention Center*, Arnold & Porter (Sept. 17, 2024), https://www.arnoldporter.com/en/perspectives/blogs/enforcement-edge/2024/09/bop-not-sending-sentenced-defs-to-mdc.

12

receive just punishment. At the same time, Nunez has served more than half of his sentence in conditions that, as described above, are best considered time-and-a-half or even two-times an ordinary sentence. Sent'g Tr., *Gonzalez*, No. 18 Cr. 669, ECF No. 250 at 17:18–18:5; *Francisco-Ovalle*, 2022 WL 1094730, at *3. He immediately accepted responsibility for his actions upon his arrest, expressed sincere remorse, and qualified for safety-valve relief. When he was incarcerated pretrial, he completed more than 80 hours of educational, behavioral, and leadership courses. PSR ¶ 6. Throughout his entire period of his incarceration, he has maintained "a spotless disciplinary record." *Francisco-Ovalle*, 2022 WL 1094730, at *3. An MDC lieutenant writes that Nunez has had zero "incident reports/infractions[] since his arrival [at MDC] on March 8, 2023." ECF No. 42-3. And, because of his good behavior and promising character, Nunez was "highly recommended to work as the Warden's Office Admin Orderly," where he has "work[ed] hard every day to accomplish the Bureau of Prison's mission." *Id.* According to the MDC lieutenant, Nunez is needed to "car[e] for his young child who is home with an ill parent," *id.*, and Nunez has expressed that he is committed to supporting his child, the child's half-brother, and their mother, upon his release, Mot. at 15; Supp. Mot. at 4.

Further, Nunez does not present a danger to the community, as reflected by the nonviolent nature of his criminal history and his recent transition to a halfway house. *See* 18 U.S.C. § 3553(a)(2)(C). Looking to the "history and characteristics of the defendant," the Court also considers (1) Nunez's traumatic and abusive upbringing and related physical and mental ailments, as detailed in the PSR, *see* PSR ¶¶ 46–47, 58–66; (2) the significant strides he has made toward rehabilitation discussed above; and (3) the letters from his family, which describe his devotion to his son and the son's half-brother, his desire to serve as an equal and supportive co-parent with their mother, and his past support for his children and father, Mot. at 2; Camilo

13

Montero 1st Ltr.; Camilo Montero 2d Letter; Def. Sent'g Sub. Exs. 6–8, 10, ECF No. 25-1. For all of these reasons, the Court is confident that the retributive, rehabilitative, and deterrent purposes of sentencing have been achieved. *See* 18 U.S.C. § 3553(a)(2)(A)–(B).

## CONCLUSION

Weighing the totality of Nunez's circumstances, the Court finds that they are "similar in gravity" to those enumerated in the Policy Statement. U.S.S.G. § 1B1.13(b)(5). Nunez has demonstrated an extraordinary and compelling basis for a sentence reduction, and such a reduction comports with the sentencing factors listed at 18 U.S.C. § 3553(a). Accordingly, pursuant to 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13(b)(5), Nunez's motion is GRANTED. It is hereby ORDERED that Nunez's term of imprisonment be reduced to time served and his period of supervised release be increased by five months. All other components of the sentence remain as originally imposed. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 31 and 42.

SO ORDERED.

Dated: October 16, 2024
   New York, New York

_____
ANALISA TORRES
United States District Judge